YVONNE DANIEL,

              Plaintiff,                           Case No. 06-13655

vs.

                                            DISTRICT JUDGE PAUL D. BORMAN

MICHAEL J. ASTRUE,                 MAGISTRATE JUDGE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

_____/

## REPORT AND RECOMMENDATION

**I.     BACKGROUND**

Yvonne Daniel brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner denying her applications for Disability Insurance Benefits (DIB) under Titles II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

**A.     Procedural History**

Plaintiff applied for benefits on July 11, 1997, alleging that she has been disabled and unable to work since August 20, 1996, due to carpal tunnel syndrome and depression (R. 34-36, 39). The Social Security Administration [SSA] denied benefits initially on December 17, 1997 (R. 24-27). A de novo hearing was held on March 9, 1999, before Administrative Law Judge [ALJ] Dennis L. Runyan (R. 359-93). Plaintiff was represented by Bruce Weider and Judith Findora testified as a vocational expert ("VE") (R. 359-60). On June 19, 1999, ALJ Runyan

found that Plaintiff could "perform [a] limited range of medium unskilled jobs,"(R. 18), and was not disabled (R. 11-20). On March 10, 2000, the Appeals Council denied review (R. 4-5).

The case was appealed to the district court, but the parties stipulated to a remand. The Appeals Counsel then remanded to another ALJ on October 23, 2000 (R. 437-38). A de novo hearing was held on April 4, 2001, before ALJ William J . Musseman (R. 536-54). Plaintiff was represented by Michael Cantor and VE Ann Tremblay was present (R. 536). On September 12, 1999, ALJ Musseman found that Plaintiff could "perform a significant range of medium" jobs (R. 473), and accordingly was not disabled (R. 466-74). On May 3, 2002, the Appeals Council vacated and remanded the decision (R. 481-84).

A third hearing was held on September 4, 2002, before ALJ Musseman (R. 555-72). Plaintiff was represented by Michael Cantor, Medical Expert Dr. Razzek, M.D., and VE Ann Tremblay testified  (R. 555-56). On March 27, 2003, ALJ Musseman determined that Plaintiff was disabled beginning on October 18, 2002 (R. 413). On June 20, 2006, Plaintiff objected to the decision on the grounds that the ALJ did not call an orthopedic specialist and should have found the onset date to be August 20, 1996, in light of the evidence (R. 398-99). The Appeals Council denied review (R. 394-96).

B.    **Background Facts**[1]

    1.    ***Plaintiff's Application & Past Work History***

In Plaintiff's Disability Report she describes her disability as her "carpel tunnel" [sic] (R. 39).  Her "ackin [sic] shooting pain swell tingling numbness" limited her ability to work. In her request for reconsideration, she reported "more numbness [and] night pain in right arm."  (R. 72)  Plaintiff worked full-time as a cutter grinder at General Motors from September 2, 1986, until August 20, 1996 (R. 59).

    2.    ***Plaintiff's Hearing Testimony***

    a.    **March 9, 1999 Hearing**

Plaintiff testified that she was forty-four years old at the hearing (R. 362).  She had a driver's license with no restrictions and was right-handed.  She completed three years of college at Fairley State College studying technical applied arts and cosmetology.  She graduated with an associates degree in 1975.

She last worked in August of 1996, when she went on sick leave through General Motors [GM], receiving benefits through August 1997 (R. 363).  She then collected insurance of approximately $1500.00 per month, which in March 1998 was transferred into medical benefits in her retirement (R. 363-64).  She worked for GM for twenty-two years as a cutter, grinder at the Willow Run plant (R. 365).  She apprenticed for almost two years when she first started at GM.  She performed the job eight hours a day and could sit or stand depending on the job she was responsible for, but stood for at least an average of six hours per day.  She sat about the

---

[1]Due to the lengthy history in this case, a comprehensive background section is relayed to ensure fairness.

other two hours of the day and also walked throughout the day (R. 365-66).  She lifted up to fifty-five pounds for about half a work day (R. 366).  She worked at various machines, lifting, grinding, turning handles and knobs, tightening, sanding, and drilling (R. 367).  Some grinding machines were at waist level and one particular machine was about five inches above her waist.

She owned a 1998 Bonneville with an automatic transmission and a pull camper (R. 367-68).  She lived in a one story home for the past fifteen years, with her husband and two children, ages eight and six (R. 368).  Her husband owned a GMAC Jimmy and a Storm, all with automatic transmissions (R. 369-70).  Her husband is employed full-time and her children are in school full-time (R. 369).

Plaintiff gets up with her children on school days at 7:30 am and goes to sleep at about 11:30 pm, sometimes midnight (R. 370).  She reported difficulty she sleeps during the day.  She indicated that her daily activity sheets were accurate and that on some days when the children do not have school, she sleeps in until noon (R. 370-71).  She takes care of her personal needs in different ways and it is not as easy as it used to be (R. 171).  She eats irregularly.

She can drive short distances around town for about fifteen or twenty minutes before she needs a break.  In an average week, she may drive a total of three hours (R. 372).  She drives about four times a day, to the grocery store or to pick up the kids.  She goes to the grocery store, about three or four minutes from her house, twice a week (R. 373).  Her husband balances their checkbook.  She went to West Virginia in January when her father-in-law passed away (R. 372).  She was gone about three days, her husband drove, and it was approximately a seven hour drive.

Plaintiffs hands keep her from working because they swell and ache (R. 373).  She has been diagnosed with carpal tunnel tendinitis.  Her hands have been a problem for the past six

years (R. 374). She also suffers from lower back, shoulder, and neck pain, as well as depression. After her hand surgery, she was provided Darvocet which she takes once or twice a day. She said the Darvocet helped, but makes her drowsy and puts her to sleep (R. 375).

She had surgery on her hands in 1997 and 1998 by Dr. Noellert. She also had two surgeries prior to 1996. She stated that the carpal tunnel affects her ability to clean her house. She cannot scrub, lift, vacuum or use anything that vibrates. She also has a hard time combing her daughter's hair, doing buttons, and driving long distances (R. 376). Plaintiff needs help with cleaning, vacuuming, mopping, and moving things due problems with her back, hands, and arms (R. 383). She explained that she cannot put any pressure on her hands because they will swell and ache.

She's had lower back and shoulder pain on and off for about three years, she has been in and out of physical therapy for two years (R. 376). Her right shoulder is the worst and a specialist told her that it pops out of the socket. She stated that the problems began around the same time as the carpal tunnel. She stated that the pain is constant and radiates up the back of her neck. She reported that the pain can get "very intense" (R. 377). She states that helping her children aggravates the pain, doing things such as zipping their pant or tying their shoes. She is not prescribed any medication for the other pains, but takes Excedrin and the Darvocet which helps it. She also lies down, uses hot pads, and ointments for the pain. She keeps a hot pad in her chair constantly and sits there for two or four hours while she watches television. It does not help the pain, but eases it (R. 377-78).

She lays down and sleeps from about 9:00 am to 1:00 pm about three times a week. If she does not get a chance to lie down during those hours, she will lay down around 3:00 pm for

about three or four hours. No doctor has prescribed these rest periods. She lays down in her bedroom for a total of about six hours a day due to fatigue (R. 379). The low back pain impairs her ability to stand too long or walk too much. She reported that she can only walk three or four minutes and sit straight for about a half hour (R. 379-80, 383).

Plaintiff was diagnosed with depression by "Dr. Raul" (sic) (Dwarakanath Rao, M.D., R. 304 ) a psychiatrist, two years prior to the 1999 hearing (R. 380). She treats with him every three to six weeks for about a half hour and he prescribes and adjust her medications. She takes Paxil once per day for the depression. She stated that it "keeps [her] from climbing the walls, but it doesn't make [her] feel any happier about going out." (R. 381). She stated that the depression makes her want to stay in and she eats and eats.

Plaintiff does not see any other doctors on a regular basis (R. 382). She reported that she has not been hospitalized overnight or longer for any reason since August 20, 1996. Her medication list completed on February 22, 1999, was accurate and the she does not have side effects, but did mention again the drowsiness associated with the Darvocet. Plaintiff has not worked or attempted to work since August 20, 1996, and has not had contact with Vocational Rehabilitation.

She explained that her hands keep her from working because she cannot do things like hold the phone for any period of time (R. 383). Both hands get sore and she drops things (R. 384). Her back also limits her ability to do things and cannot get clothes out of the dryer and even pulling a chair out aggravates her back. Her ability to concentrate is limited by her fatigue.

Plaintiff also has nose bleeds every day to every other day (R. 385). It bled the day before the hearing for about thirty minutes and she ended up going into the emergency room (R.

385-86).  First, she went to her doctor's office, but he sent her to the emergency room.  (R. 386).  She averages about four nosebleeds a week, usually under thirty minutes.

### b.        April 4, 2001 Hearing[2]

Plaintiff affirmed that she had not worked since her alleged onset date (R. 540).  She stated in her prior employment the heaviest she lifted was twenty-five to thirty pounds (R. 541).  She worked with her hands and also had to read blueprints.  She had some overhead work and she also had to bend at times.  She stopped working because her hands were in a lot of pain and they would swell, ache and stiffen (R. 542).

She is retired from GM on medical disability and receiving a pension.  She received a worker's compensation settlement for $98,000 after fees (R. 542-43).  She had not had any surgeries since the first hearing and had not seen her surgeon, Dr. Noellert, since February 1999 (R. 543).  There was nothing more he could do except more surgery and it was not really worth it (R. 544).

Plaintiff reported her hands still swell, ache and tingle.  She also has pain shooting up her arms.  She has difficulty holding and gripping at times.  Plaintiff does not know how to type, but can write a short letter (R. 544-45).  She does not write much, but reports that if she did, her hands would swell "in the middle of [her] fingers" (R. 545).

She still treats with Dr. Siddiqui and he prescribes her pain medication, but she did not take any prior to the hearing because it makes her groggy (R. 546).  She continues to have difficulty with neck, upper arms and lower back pain.  Her lower back problems limit her ability to stand for long periods of time and if she sits, she has to stretch before walking (R. 546-47).

---

[2]Plaintiff's testimony at this second hearing is omitted where it is repetitive.

She can only stand in one place for about two minutes and has to lean on something for support (R. 548). She cannot walk long distances unless she leans on something, and she can sit for about fifteen to twenty minutes depending on the chair. Sneezing can also throw her back out (R.547). Dr. Siddiqui said he cannot do anything for her lower back. She has been treating with a chiropractor about once per week for the last two years.

She continued to have nosebleeds (R. 549). They occurred for three or four days at a time then she might not have one for a week or two. She sees Dr. Siddiqui for her nosebleeds. Occasionally she needs emergency treatment to cauterize the bleeding source. She stated that it has been a problem for about a year. She reported that she has not been hospitalized as an inpatient in the last two years.

Plaintiff was seeing a therapist, Mr. Liebermann every other week for depression (R. 549-50). She was always tired, would rather sleep and lacked energy. She also reported weight gain (R. 550). She does not like to go out unless she has to and is not social. For example, she only went to a family baby shower recently because she could not get out of going. She described the following activities on a normal day:

> I wake up in the morning with my children, and I oversee them getting ready for school, and you know, help them - - get them oatmeal. Oh, I try to do that for them, because I don't like cooking with the stove and things like that. And help my daughter with her hair the best I can, and see them off to school. A lot of times, when they go to school, I go back to bed . . . I wake up with my husband, usually. He gets up about 11:00. And I fool around with him, watch some television, have breakfast, and wait for him to go to work. . . [then] [u]sually, go back and lay down - - and wait for my kids to come.

(R. 550-51). Typically, she does not get dressed. Her son gets home at 3:00 pm and her daughter gets home at 4:00 pm (R. 551). Once her children get home, she helps them get a snack and do homework "as much as [she] can." Her husband helps her plan dinner and set up, but she

can do some things on her own.

She reported that she drives to store sometimes and picks her son up from games or other activities (R. 551-52). She also does the same for her daughter, but has to push herself (R. 552). She does some shopping with her son's help lifting bags and loading the car. She drives six miles to the store about twice per week. She picks up her kids from school depending on their activities and might drive them to school if they miss the bus (R. 553). Her hands will swell when she drives. She does some housework, but does not vacuum. She dusts a little sometimes and the kids work with her.

### c. September 4, 2002 Hearing[3]

Plaintiff was diagnosed with sleep apnea (R. 565-66). She has not treated with Dr. Noellert since 1999, because there was nothing more he could do for her (R. 565). Dr. Noellert referred her back to Dr. Siddiqui for her back problems. Dr. Siddiqui stopped treating her as well because there was nothing more he could do. He did refer her to classes to help her "learn how to deal with [her] back."

She first saw Dr. Harkaway in September 2001 for her sleep apnea, and in July 2002 she stated using a CPAP machine (R. 565-66). She stated in the last two months she is not as sleepy and can stay up a little longer, but there is "a certain point where it will wear off" (R. 566-67). Most days she still naps from 3:00 to 5:00 pm. She still reported aching and swelling in her fingers and shooting pain down both arms into her hands for the last few years (R. 567).

---

[3]Plaintiff's testimony at this third hearing is omitted where it is repetitive.

9

3. *__Medical Evidence__*

Plaintiff has a history of depression. In January 1996, Dr. Leland recommended evaluation of Plaintiff's depression (R. 122). Plaintiff was treated with Zoloft (R. 333). She participated in outpatient counseling between 1996 and 1999 (R. 126, 140-163, 304-54). In May 1998, Dr. Rao diagnosed major depression in remission (R. 306). She continued to take Zoloft. In November 1996, Plaintiff was reporting more anxiety and her depression was described as in "partial remission." (R. 159). In December 1996, she reported improvement in mood and her depression was in remission (R. 160). In March 1997, her depression was again described as in "partial remission." (R. 161). By June 1997, Plaintiff reported improvements with increased dosage of Zoloft (R. 162). In June 2002, Plaintiff was switched to Paxil for her depression (R. 496, 510).

In November 1993, Plaintiff had early arthritis to the apophyseal joints of her cervical spine and narrowing disk space at C5-C6, C6-7 (R. 164, 170). An MRI on October 3, 1994, showed midline C4-5 herniated disc with bulging at other levels (R. 202, 205). In November 1994, she "had marked improvement in her neck and shoulder complaints" and completed physical therapy for her cervical spine (R. 168, 207).

Plaintiff's medical records document a history of carpal tunnel syndrome in both hands dating back to 1993 (R. 165-67). She was treated by orthopedic surgeon, Dr. Raymond Noellert, who performed carpal tunnel surgery on her right hand in April 1994, (R. 172-73), and two months later on the left hand (R. 177-78).

She had hand rehabilitation until September 22, 1994 (R. 189-97, 199, 211, 213). Nerve conduction study October 3, 1994, showed "evidence of a borderline right sensory carpal tunnel

syndrome as seen by the difference in the median sensory latency as compared to the ulnar sensory latency. There was no denervation present. [] There is no electrodiagnostic evidence of a right cervical radiculopathy." (R. 201, 203-04). She returned to work in late October 1994, with restrictions on both hands, prohibiting use of air or vibrating tools, handling over 2 pounds repetitively, and lifting of 20 pounds once per 30 minutes (R. 206). She wore a wrist brace as needed. She was to begin with 2 hours per day for two weeks, 4 hours per day for two weeks, 6 hours per day for two weeks, then 8 hours per day. In November 1994, her return to work was going well, but "[h]er biggest problem [was] holding the piece in the left hand with the arm supinate and this [was] somewhat painful." (R. 207).

In May 1995, these restrictions were still in place with a return examination in six months (R. 212). On November 21, 1995, x-rays of both hands were normal (R. 120), but a November 22, 1995, EMG was abnormal EMG (R. 121). She had left median mononeuropathy at the wrist.

In August 1996, Plaintiff went to the emergency room with severe pain in both her hands (R. 127). She was told stay off work. X-rays of each hand showed mild sclerotic changes in carpal bones and minimal degenerative arthritic changes (R. 128). Again, an abnormal EMG showed bilateral median mononeuropathy (R. 129). She continued to have pain in both hands in August and September 1996 (R. 137). She was told to stay off work until she saw Dr. Noellert.

October 7, 1996, Plaintiff had "[p]ersistent pain in both hands." (R. 130). On October 9, 1996, Dr. Noellert examined Plaintiff and observed full shoulder mobility, full wrist and digital motion with good flexibility, and negative Phalen's test (R. 214). X-rays of both hands showed minimal degenerative changes at the CMC joints of both thumbs, but were otherwise normal (R. 214). Dr. Noellert re-evaluated her and gave a complete work restriction (R. 214-5). In October

1996, she returned to hand rehabilitation until November 4. (R. 216-22)

On November 12, 1996, she had some cervical tenderness and spasm, but exhibited no cervical limitation of motion and had full shoulder motion (R. 223). Examination showed positive Finkelstein's, negative Phalen's, and normal Allen's. An EMG and nerve conduction study (NCS) on November 18, 1996, showed no evidence of cervical radiculopathy or upper extremity mononeuropathy (R. 225-27). On November 21, 1996, "[l]ocal examination showed ROM of the right wrist was painful and left hands painful and restricted. Grip was weak. No Muscular atrophy present." (R. 138). On November 27, 1996, she still reported hand pain, but the doctor noted mild carpal tunnel syndrome and no repeat surgery necessary (R. 139).

In January 1997, examination by Dr. Noellert revealed symptoms consistent with recurring carpal tunnel syndrome bilaterally and surgery was discussed (R. 228). On January 28, 1997, she went to hand rehabilitation (R. 229). In February, she underwent revision carpal tunnel release surgery (R. 230-34). Two weeks post-surgery, she had minimal pain and significant reduction in numbness (R. 236). She also regained excellent digital motion. Excellent digital motion was noted again in April (R. 244, 247). Yet, on April 22, 1997, her grip strength was weak and she was tender at the ulnar nerve and the later epicondylar origin (R. 247). From March 10, until May 8, 1997, she went to hand rehabilitation (R. 237-43, 245-46, 248-53). On May 20, 1997, three months post surgery, she noted significant improvement, especially at night (R. 254). Yet, she continued to have weak grip strength, positive Tinel's and carpal compression test.

Plaintiff returned to work as a cutter/grinder in May 1997, with restrictions to avoid power or vibratory tools (R. 271). She underwent examination by Dr. Mune Gowda in May 1997

(R. 270).  Plaintiff reported an increase of pain, soreness, numbness, and a tingling sensation in her hands, which continued to bother her and wake her up at night (R. 271).  All of Dr. Gowda's clinical findings were negative for carpal tunnel; she had full flexion and extension in the elbows with normal pronation and supination, and negative median and ulnar nerve examinations (R. 272).  She had no numbness or tingling in her left hand, but complained of pain, soreness, numbness and a tingling sensation in all of the digits of the right hand (R. 273).  "Tinel's sign is positive in both hands.  Phalen's test is also positive in both hands.  She tells me all of the fingers are tingly."  Dr. Gowda reported: "[t]his is somewhat atypical."  The remaining tests were negative.  He also found that there was slow recuperation and more severe swelling at that time and recommended continued physical therapy (R. 275).

In July 1997, she continued to have weak grip strength, positive Tinel's and carpal compression test (R. 255).  Plaintiff complained of pain, numbness, and weakness in her hand and persistent medial-sided elbow pain and significant shoulder pain.  Her left hand was much improved after her revision.  She consented to revision, decompression, and fat pad flap coverage surgery in her right hand.

In mid-November and early December 1997, Plaintiff described pain and numbness in both hands, then with acute back pain and "[a]ppeared to be very painful" (R. 279).  On December 9, 1997, Dr. Jeoffrey Stross reported that Plaintiff demonstrated good range of motion in both shoulders and full range of motion in both elbows (R. 258). He noted some decreased sensation over the distribution of the carpal tunnel (right greater than left) (R. 258).  Dr. Stross opined that she had significant carpal tunnel syndrome that limited her ability to use her hands in a meaningful way (R. 258).  Beyond the hand problems, he noted mild right trapezius spasm and

degenerative arthritis in the neck. He believed that she had a total and permanent disability (R. 258).

In December 1997, Plaintiff consented to further surgery on her right hand (R. 259). She underwent right revision carpal tunnel release surgery in January 1998 (R. 261-63, 265). Post-surgery, treating physician Noellert reported nearly full digital motion, no swelling and good capillary refill (R. 267). Four weeks following the surgery, she had full digital motion, improvement in sensibility and marked decrease in local tenderness, but her grip strength was still poor (R. 276).

In February, her "working diagnosis" included lower back pain (R. 280). In April, Dr. Noellert reported that Plaintiff had subjective pain relief following her hand surgery three months earlier of greater than 75% (R. 357). She had no numbness and little to no night pain, and digital motion was full and fluid. She had negligible grip strength on the right and weakness on the left. He opined that she had significant weakness and functional deficits with respect to her endurance for daily activities, but encouraged her to use the hand in a functional fashion "as much as possible" in order to recapture her strength. He also opined that she required pacing and activity modification and "is best served with medi[c]al retirement." In March 1998, Dr. Noellert described Plaintiff's digital motion as full, but grip strength was weak (R. 277). She had no vasomotor disturbance. Dr. Noellert opined that her progress continued to be satisfactory. He stated that "[t]he therapist will gradually advance strengthening activities."

In June 1998, Dr. A. Siddiqui, a treating physician, stated his opinion that Plaintiff's problems were "so bad that she has been totally incapacitated and not able to work" (R. 268). He reported that Plaintiff had tendinitis of both upper extremities that was not responding to

non-steroidal medications (Naprosyn), and that she took Tylenol with Codeine and Zoloft, which interfered with her ability to concentrate. (R. 268).  Plaintiff also had lower back pain.  Dr. Siddiqui observed positive straight leg raising, restricted range of motion, and decreased knee and ankle reflexes (R. 268-69). He believed that she was "totally crippled" and could not perform any job sitting, standing, or bending, due to her back problems (R. 269).  In late June 1998, physical examination revealed "ROM of both shoulders was markedly restricted.  ROM of the right elbow was also very restricted an painful," (R. 293), x-ray of shoulders and elbow were normal (R. 287).

In July 1998, Dr. Paul Shapiro performed needle EMG sampling on Plaintiff as part of her back pain evaluation (R. 290-91). He noted no EMG abnormalities to suggest a lumbosacral radiculopathy/plexopathy (R. 290).  He recommended she undergo physical therapy.  If physical therapy did not resolve her problems, he recommended a CT Scan of the lumbar spine, then "referral to the Michigan Pain Institute for consideration of epidural steroid injections to try to manage her back pain."  A fall in August 1998 was thought to be secondary to findings of mild L4 irritation.  (R. 293-94).  In September 1998 x-ray revealed Plaintiff "ha[d] osteopenia. Degenerative disc disease but no acute fracture of the lumbar spine" (R. 292).

In July 1998, Dr. Noellert observed that Plaintiff continued to have good relief of the numbness and night pain, and slow but steady improvement in terms of her daily use of her right hand (R. 356). On examination, he noted very satisfactory flexibility in the fingers, good motion in the wrist, and no evidence of ongoing neuropathy (R. 356).

In February 1999, Dr. Noellert reported that, one year post-revision carpal tunnel release on the right, Plaintiff "continues to note improvement regarding her level and resting comfort in

both hands." (R. 355). Examination revealed good shoulder mobility and "markedly improved" intrinsic flexibility, no focal neurologic deficits, or vasomotor instability. Dr. Noellert observed diminished grip strength. He opined that she had difficulty maintaining sustained activities with her hands and had some days when she could pace herself with chores, and other days when it was extremely difficult. There is a gap in treatment in the medical records from this point in February 1999 until September 2001.

In September 2001, Dr. Harkaway's treatment notes indicate Plaintiff underwent a formal sleep study and was put on a CPAP machine and advised against operating a motor vehicle (R. 498-501). In May 2002, Dr. Siddiqui discussed Plaintiff's sleep apnea and lack of treatment for her depression (R. 502). He correlated the two. A sleep study with CPAP was performed on May 30, 2002 (R. 503-05). The study found that the sleep apnea was better controlled with the CPAP machine (R. 505). In June 2002, severe depression was noted and CPAP was recommended for sleep apnea (R. 510).

Plaintiff was diagnosed with left breast cancer on October 18, 2002, (R. 523) which was confirmed with biopsy (R. 530-32). She underwent a lumpectomy in November 2002, and chemotherapy thereafter (R. 512-13, 515-16, 521-22, 534-35).

### 4. *Vocational Evidence*

VE Ann Tremblay testified at the September 4, 2002, hearing. (R. 567-71). The ALJ asked her to assume presented a claimant with Plaintiff's age, education, and work experience, and

> limited to an exertional level and a full range of sedentary with non-exertional limitations of no repetitive gripping or grasping with force. No air, torque, or vibrating tools, and no overhead work. No below waist level work. No repetitive assembly line use of the upper extremities.

(R. 568). VE Tremblay testified that such an individual would not be capable of Plaintiff's past

relevant work, but would be capable of the following positions, security monitor, 2,100; order clerk (order checker), 500; and machine operator (machine tender), 2,700 (R. 569).  The ALJ asked VE Tremblay to assume the following in addition to the first hypothetical; "limitation of a [sic] unpredictable need to be off task because of excessive drowsiness to the point where she would fall asleep on an unpredicted basis."  VE Tremblay noted that no jobs would be available with the additional limitation.

Plaintiff's counsel then questioned VE Tremblay (R. 569-71).  He asked whether there is "any usage of the hands in the security monitor position (R. 569).  VE Tremblay acknowledged that "[t]here could be some minimal writing and minimal use of the telephone" (R. 569-70).  She clarified that "[i]n the security monitor position you may have to write for just a brief note that you had contacted the appropriate person, and where there may have been an intruder or a problem with a notation." (R. 570).  VE Tremblay estimated that this takes one or two minutes per occasion (R. 571).

VE Tremblay added that there could also be minimal writing with the order clerk position (R. 570).  Specifically, she stated that this position "might require occasionally checking off an invoice with just check marks or x's through the day."  (R. 571).

VE Tremblay testified that the machine tender position required "minimal use of the hands to stop a machine, pressing buttons.[4]  Usually what happens is when the machine jams up, this person is watching the machine, and when it jams up, they shut the machine off and they call someone to come and repair and fix whatever the problem is."  VE Tremblay testified, in response to the Plaintiff's attorney's question regarding whether any of the jobs were mindless, that "[t]hey

---

[4]VE Tremblay testified "that would be palm buttons, or buttons to shut down the machine," on a bad day ten to fifteen times (R. 571).

are simple tasks, one and two piece tasks."   VE Tremblay testified that the positions all had a sit/stand option.

### 5.   *Medical Expert Testimony*

On September 4, 2002, Dr. Razzek, M.D., testified (R. 558-64).  Dr. Razzek is a board certified internist (R. 558).  He stated that his professional qualifications were accurate and up to date.  Plaintiff's counsel declined to question the doctor's qualifications (R. 558-59).  Dr. Razzek testified that he was familiar with the Social Security Rules and Regulations pertaining to his expertise (R. 559).

Dr. Razzek found two major problems while reviewing Plaintiff's medical file, carpal tunnel syndrome and depression.  The doctor noted that he does not usually testify regarding psychological issues.

The only significant treatment between 1999 and 2002 noted by Dr. Razzek was the muscular skeletal physical therapy (R. 560).  Dr. Razzek testified that none of the impairments met a listing.  He testified that she should avoid repetitive type work and aggravating instruments.  He further testified: "[i]n regard to the depression I am not saying anything about that."

Plaintiff's attorney questioned the doctor.  Dr. Razzek agreed that there were examples of weight and use restrictions in Plaintiff's medical file.  He also agreed that her recovery was slower than normal and not a full recovery as expected (R. 561).  Dr. Razzek also affirmed that she treated with an orthopedic, then was treated by an internist.  He agreed that an internist would defer to an orthopedic surgeon in a case such as Plaintiff's.  Dr. Razzek noted Plaintiff's cervical back problems and stated that he "wasn't too impressed when he read about it," and that her weight restriction already in place would cover her cervical back difficulties (R. 562).

Dr. Razzek reviewed the medical file information on sleep apnea at the hearing.  He said

the condition would not impose physical restrictions.  Yet, depending on her symptoms associated with the sleep apnea, he stated that "if she sleeps any time she sits for a couple minutes it can cause restriction.  But if it is managed the people usually, especially I see she is on CPAP she would be just fine."  (R. 562-63).  The doctor agreed that if a person is sitting and just doing simple repetitive tasks they would have a tendency to fall asleep (R. 563).  Nevertheless, Dr. Razzek testified that "[u]sually with the CPAP they get quality sleep, and they are as good as any one the next day."  Further, the doctor stated that the test the CPAP to check its effectiveness (R. 564).

**6.  _ALJ Musseman's March 27, 2003 Decision_**[5]

ALJ Musseman on March 27, 2003, found that Plaintiff met the disability insured requirements of the Act through December 31, 2002, her last date insured, and that she had not engaged in substantial gainful activity since the alleged date of disability onset in August 1996 (R. 405).  The ALJ found that "[t]he medical evidence indicates that the claimant has carpal tunnel syndrome, left shoulder pain, degenerative disc disease of the lumbar and cervical spine, and breast cancer (diagnosed October 18, 2002), impairments that are severe within the meaning of the regulations." (R. 406, 412).  Yet, her "impairments are not severe enough to meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4" (R. 407).

The ALJ found that Plaintiff's allegations regarding her limitations prior to October 18, 2002, were not fully credible  (R. 408-09, 412).  Plaintiff's breast cancer was diagnosed on that date.  Plaintiff has the residual functional capacity (RFC) from August 20, 1996, until October 17, 2002, "to perform work except for lifting and carrying more than ten pounds occasionally;

_____

[5]The earlier ALJ decisions are not relevant to this review of the final ALJ decision in 2003, which is under review.

19

repetitively gripping or grasping with force; using air, vibratory, or torque tools; working overhead or below waist level; and using the upper extremities repetitively for assembly-type line work. The claimant required a sit/stand option." (R. 409, 413). He noted that until October 18, 2002, the Plaintiff could perform the three jobs identified by VE Tremblay. Given, her age, education, work experience, and her RFC, Plaintiff was "not disabled" until October 18, 2002 (R. 413).

## II.    ANALYSIS

### A.    Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.[6]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

## B.    Factual Analysis

In her motion Plaintiff argues an earlier onset date be found in August 1996.  She also argues that the medical expert that testified at the most recent hearing was not qualified to comment on her orthopedic impairment pursuant to *Sherrill v. Sec'y of Health and Human Services*, 757 F.2d 803 (6th Cir. 1985).  Further, according to Plaintiff, this remand opinion was not in compliance with the remand order.  She also argues that the ALJ's RFC is not supported by substantial evidence including her treating physicians' opinions, and that the VE testimony conflicts with her doctors' opinions.  Plaintiff also argues that the ALJ failed to include the psychiatric evidence in his hypothetical to the VE.  Defendant also thinks that Plaintiff argues that the ALJ improperly assessed credibility.

### The Remand Order and the Medical Expert

The remand order stated specifically that the ALJ was required to obtain additional evidence "if available" on Plaintiff's orthopedic and mental status and also to "[o]btain evidence from a medical expert to clarify the nature and severity of the claimant's orthopedic impairments

---

[6] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

during the entire period at issue (20 CFR 404.1527(f) and Social Security Ruling 96-6p)." (R. 483). It is not surprising that the Appeals Council wanted additional orthopedic evidence because both ALJ Runyan in his June 1999 decision (R. 19) and ALJ Musseman in his September 2001 decision (R. 471 and 473) found Plaintiff could do medium work which involves occasionally lifting and/or carry 50 pounds and frequently 25 pounds. These exertional findings are not supported by the record as it existed at the time of the remand and it is no surprise that the Appeals Council remanded to determine if any additional expert orthopedic evidence might confirm or repudiate such findings.

      Dr. Razzek testified at the hearing as the medical expert but he was a board certified internist, and not an orthopedic or psychiatric expert (R. 558-64). Upon cross examination by Plaintiff's attorney Dr. Razzek testified in response that, as an internist, he would defer to the opinion of an orthopedic surgeon such as Dr. Noellert (R. 561).[7] Further, Dr. Razzek refused to comment on Plaintiff's depression, although there was not a psychiatric report from a psychiatrist to which he needed to respond as there was with regard to Dr. Noellert's opinion concerning Plaintiff's use of her hands (R. 560). Dr. Razzek testified without contradiction that none of Plaintiff's impairments met a listing. He agreed that Plaintiff's work restrictions should include avoiding repetitive type work and aggravating instruments (R. 560).

      Plaintiff argues that the case should be remanded because of Dr. Razzek's lack of

---

[7] While Plaintiff had some impairments related to her cervical and lower back, involving cervical arthritis at C 5-6 and C6-7 and some disc impairment at C 4-5, these impairments were improved by November 1994 (R. 168, 207) and there were no range of motion limitations in November 1996 (R. 223) and no cervical radiculopathy or upper extremity mononeuropathy (R. 225-27). Her cervical and back limitations were adequately accommodated by the ALJ limiting her to sedentary work. Her major problem related to her hands and wrists.

specialized knowledge and relies on *Sherrill*.  In *Sherrill*,

> the district court relied heavily upon the ambivalent testimony of a non-treating physician to the exclusion of evidence offered by psychiatrists who, in essence, stated that Sherrill is disabled because of her psychiatric impairment. The district court's reliance, however, is disconcerting not only because Dr. Lewis was a non-treating physician who rendered ambivalent testimony, but also because Lewis is a physician who specializes in internal medicine and sub-specializes in pulmonary disease. Dr. Lewis, therefore, is not a psychiatrist. Consequently, his testimony alone does not rise to the level of substantial evidence establishing the nonexistence of Sherrill's psychiatric impairment.

757 F.2d at 805.  Here, the medical expert was ordered for the sole purpose of evaluating Plaintiff's "orthopedic impairments."  Dr. Razzek's testimony hardly complies with that directive.  Yet, the legal question is whether on these facts, Dr. Razzek lack of the appropriate specialization in orthopedic impairments is the basis for a remand.

This case is significantly different than the *Sherrill* case.  In that case Plaintiff had psychiatric testimony that she did qualify for disability under the Listing of Impairments, and the Commissioner's testifying expert acknowledged that the case was a close one and that reasonable minds could disagree on that issue.  In this case, Plaintiff was treated by orthopedic specialist but he did not indicate that Plaintiff met any of the Listing of Impairments.  In October1996, Dr. Noellert, the orthopedic surgeon, re-evaluated Plaintiff after surgery and gave a complete work restriction after her pain and numbness returned notwithstanding her initially getting "good relief of her complaints." (R. 214-5).  She never returned to work but did have follow up hand surgery.  In April 1998, three months following this second round of hand surgery,  Dr. Noellert reported that Plaintiff had subjective pain relief of greater than 75% (R. 357). She had no numbness and little to no night pain, and digital motion was full and fluid.  Six months after this surgery, Dr. Noellert in July 1998 still thought Plaintiff was "an appropriate

candidate for medical retirement," yet he found Plaintiff had "good relief of preoperative paresthesias and night pain" and was making "slow but steady improvement with regard to day-today use of the hand." (R. 356). Her finger flexibility was "very satisfactory" but her hand strength was still diminished to 20 pounds on the right compared to 35 pounds on the left. While "sustained use" caused "some degree of swelling and aching" this was "controlled and nonprogressive with appropriate activity modification and other supportive measures such as heat, stretching, and intermittent splinting" (*Id.*). She had no evidence of ongoing neuropathy. At the next examination in February 1999, Plaintiff "continue[d] to note improvement regarding her level and resting comfort in both hands." (R. 355). While Plaintiff's counsel focuses on Dr. Noellert's statement that she continued to have "significant limitations with regard to the use of her hands for any type of sustained activity including activities of daily living," he noted that some days she found it difficult to perform housework, cooking and cleaning, but on other days she could do these tasks if she paced herself. While Dr. Noellert added that "[t]he patient is nearing maximum medical improvement. I would continue to support long-standing activity restrictions as previously outlined;" it is not clear what these restrictions were, yet, this is hardly an unqualified statement that Plaintiff is disabled from all employment. Nor is it clear that the activity restrictions Dr. Noellert wanted were not adequately accommodated by ALJ Musseman's restriction of Plaintiff to a limited range of sedentary work that involved "no repetitive gripping or grasping with force. No air, torque, or vibrating tools, and no overhead work. No below waist level work. No repetitive assembly line use of the upper extremities." (R. 568).

In June 1998, Dr. A. Siddiqui, a primary care treating physician, opined that Plaintiff's

problems were "so bad that she has been totally incapacitated and not able to work" (R. 268). ALJ Musseman rejected Dr. Siddiqui's opinion of complete disability on the grounds that it is inconsistent with the record as a whole and with Dr. Siddiqui's own treatment notes (R. 409-10). Dr. Siddiqui is an internist and not the orthopedic surgeon treating Plaintiff's hand problems and provides no medical reasons for his opinion.

While ALJ Musseman did not comply with the remand order by having an appropriate medical expert, he does appear to accommodate the likely concern of the Appeals Council in significantly modifying the finding of Plaintiff's exertional capacity from medium to a limited range of sedentary work. While courts are divided on whether federal courts have jurisdiction under §405(g) to reverse and remand for an ALJ's failure to follow the directives of the Appeals Council, on this record it is recommended the Court limit its review to the clear jurisdictional terrain of §405(g) and review the matter solely whether there is sufficient evidence to uphold the final decision of the Commissioner.[8]

---

[8] *Gabaldon v. Barnhart*, 399 F.Supp.2d 1240, 1251 (D.N.M. 2005) (Magistrate Judge Leslie C. Smith):

> I note initially that Plaintiff asserts the A.L.J. erred in not following the directives contained in the Appeals Council's June 26, 2003 remand order. (Doc. 10 at 19; R. at 80.) Specifically, the A.L.J. did not comply with the Appeals Council's directive to obtain a second mental health consultative examination. (R. at 80.) Although Plaintiff appears to be correct in asserting that the A.L.J. did not follow this directive, this Court's jurisdiction extends only to the final decision of the Commissioner, "which in this case is the ALJ's second decision." *Gallegos v. Apfel,* 1998 WL 166064, at *1 (D.N.M. Apr. 10, 1998) (citing 42 U.S.C. § 405(g); *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). As such, I do not have jurisdiction to consider Plaintiff's contentions regarding the A.L.J.'s adherence to the Appeals Council's remand order.[FN9] *Id.*
>
> ---
>
> FN9. There is disagreement on the issue of whether a district court has jurisdiction to remand because the A.L.J. did not comply with the Appeals Council's directives. For example, the court in *Lok v. Barnhart* recently granted a

**RFC & Treating Physicians**

Plaintiff argues that the ALJ's RFC is inconsistent with Dr. Noellert's opinion. She argues that ALJ Musseman improperly relied on the opinions of Dr. Abbasi and Sethy whose review of the record stopped in 1997 and 1998, respectively.

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[9] Yet, an administrative decision can reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

---

claimant's motion to remand because the A.L.J.'s decision was not consistent with an earlier remand order of the Appeals Council. 2005 WL 2323229, at *6 (E.D.Pa. Sept. 19, 2005). Like *Gallegos,* however, I find that "the ALJ's adherence to the Appeals Council's remand order is not cognizable by this court." *Gallegos v. Apfel*, 141 F.3d 1184 (Table), 1998 WL 166064, *1 -2 (10th Cir. 1998) (10 Cir. 1998):

> Plaintiff's challenge to the ALJ's adherence to the Appeals Council's remand order is not cognizable by this court. By statute, our jurisdiction extends only to the Commissioner's final decision, which in this case is the ALJ's second decision. *See* 42 U.S.C. § 405(g); *see also, Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992). Plaintiff does not argue that the ALJ failed to adhere to a legal requirement to obtain additional medical evidence in reaching her second, final decision, but only that the ALJ did not follow the Appeals Council's direction. Therefore, plaintiff's first issue is not within our jurisdiction.

[9]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) *See also*, S.S.R. 96-2p.

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 404.1527(d)(2). Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity, or a general and conclusory statement of disability or inability to work. Dr. A. Siddiqui's conclusory opinion on total disability could be rejected under this regulation.

From August 20, 1996, until October 17, 2002, ALJ Musseman determined Plaintiff had the RFC "to perform work except for lifting and carrying more than ten pounds occasionally; repetitively gripping or grasping with force; using air, vibratory, or torque tools; working overhead or below waist level; and using the upper extremities repetitively for assembly-type line work. The claimant required a sit/stand option." (R. 409, 413). Plaintiff argues that although this RFC is consistent with Dr. Noellert's opinion from 1994 through 1995, it is not consistent with her abilities after her last two surgeries and the last year she worked. ALJ Musseman noted in his 2003 decision that there was no new evidence since 1999 (R. 408).

Plaintiff acknowledges this, but argues that the lack of ongoing treatment is because there is nothing more Dr. Nollert, or the other physicians, could do for her. In his 2001 decision, ALJ Musseman discusses Dr. Nollert's February 1999 treatment notes, but neglects to discuss them specifically in connection to Plaintiff's residual functional capacity. Yet, as noted above, it is not clear that the RFC used by fell beyond the restrictions Dr. Nollert in 1999 would have found suitable.

ALJ Musseman noted the opinions of the State Agency physicians, Dr. Abasi in November 1997 and Dr. Sethy in March 1998,

> that the claimant can lift and carry up to 20 pounds occasionally and ten pounds frequently and can stand or walk a total of six hours in an 8-hour workday (Exhibit 7E).

(R. 409). Yet, ALJ Musseman's RFC is more restrictive than the state agency physicians', thus, there is no error as to the limited reliance on these physicians' opinions.

It is also significant that Dr. Noellert's concern was with sustained use of the hands which caused Plaintiff problems, he acknowledged her ability to cope with activity management and pacing herself. Durign the cross examination of VE Tremblay, she notes in the 2,100 security monitor positions there would be only minimal use of the hands for answering the phone or making notes of an intruder or other problem which would take only one to two minutes four to five times a day (R. 570-71). There was also only minimal use of the hands for writing in the 500 order clerks jobs or occasionally pressing a stop button when a machine jams up to await a repair person in the 2,700 machine tender jobs. These jobs do not appear to violate Dr. Noellert's concern about sustained use of the hands.

**VE Testimony**

Further, Plaintiff argues that the VE's testimony conflicts with the treating physicians' opinions. Plaintiff points out that the VE testified at the 2002 hearing and "agreed that even the most sedentary of the positions of guard monitor required some meaningful use of the hands." (R. 570-71). Yet, a reasonable fact finder could conclude on this record that Plaintiff could do one to two minutes of writing four to five times a day. In addition to the security monitor jobs, ALJ Musseman also found Plaintiff capable of an order clerk position and a machine tender position (R. 413). Plaintiff does not challenge these findings. The two other positions combined equal 3,200 positions, a significant number. *Hall v. Bowen*, 837 F.2d 272, 274-75 (6th Cir. 1988) (finding that between 1,350 and 1,800 jobs in the region was sufficient, although there is no "special number"). Thus, there still exists a significant number of jobs, and even if the machine tender position is taken out, there is no error.

**Psychiatric Evidence**

Plaintiff does argue that ALJ Musseman should have included the psychiatric evidence in his hypothetical to VE Tremblay. Yet, as Defendant points out, Plaintiff fails to argue what impairments result from the psychiatric evidence in this case and what exactly ALJ Musseman failed to include. Issues that are adverted to in a perfunctory manner without some effort at developed argumentation are generally deemed waived. *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir.2002).

Further, the Sixth Circuit has clarified what a hypothetical should include:

In *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), we stated that a hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions. *Foster*, 279 F.3d at 356. In *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777 (6th Cir. 1987), a case cited in *Howard*,

we likewise determined that a vocational expert need only "take[ ] into account plaintiff's limitations." *Varley*, 820 F.2d at 780.

*Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (citations omitted). Plaintiff's depression was a *condition* that was not necessary to the hypothetical posed to the VE. Again, it is the limitations resulting from the condition that must go into the hypothetical, and it is these limitations upon which Plaintiff is silent in her brief.

### **Credibility**

Plaintiff challenged the ALJ's credibility determination suggesting that ALJ Musseman should not have considered her lack of ongoing treatment. In evaluating subjective complaints of disabling pain, this Court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then, 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

In order to determine disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3) which lists the following factors:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual

takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 CFR § 404.1529(c)(3). Social Security Ruling (SSR) 96-7p points out that the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Policy Interpretation Rulings Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7p, 1996 WL 374186, at *2.

ALJ Musseman in this case stated the following regarding Plaintiff's credibility:

[a]lthough the claimant has alleged experiencing debilitating pain, the evidence does not support her allegations. There has been no frequent or intensive treatment or change in the treatment regimen. The claimant has not undergone transcutaneous electrical nerve stimulation (TENS) injections, or pain clinic evaluation or treatment. There has been no frequent change in prescribed medications, dosage, or type, and no side effects noted or alleged in the file. There is a lack of objective signs, reliable indicators, and clinical findings. While the Appeals Council was concerned about lack of medical evidence, it is clear that the claimant sought treatment only six times in more than two years and received no significant treatment during that time.

The claimant's daily activities were full and varied prior to her cancer diagnosis. She cooked, watched television, cared for her children, cleaned house, visited with others, groomed and bathed, watched sporting events, did laundry, worked in the flower garden, read helped her children with their homework, drove, went shopping, used the telephone, paid bills, did volunteer activities, and went out to eat or to the movies. The claimant was able to use public transportation. She loaded the dishwasher, baked, and went to the park and the library (Exhibits 3E, 5E, 6E, 9E, and 16E).

The claimant wants to argue that she cannot use her hands at all. However, this allegation is not compatible with the evidence from the treating physicians, the medical expert, the claimant's daily activities, and the claimant's own recent reports of her daily activities (Exhibit 16E). Moreover, there is no objective medical evidence to

confirm this allegation.

> While the undersigned does not doubt that the claimant experiences some pain, her statements concerning her impairments and its impact on her ability to work are not entirely credible in light of the claimant's own description of her activities and life style, the degree of medical treatment required, the reports of the treating and examining practitioners, the medical history, and the finding s made on examination.

(R. 408-09). When considering the ALJ's reasoning and the evidence of record the undersigned cannot say that his credibility determination is without substantial evidence.

Regarding ALJ's comments on the lack of ongoing treatment, the treating orthopedic physician did state that there was nothing more they could do for Plaintiff. Dr. Noellert stated "[t]he patient is nearing maximum medical improvement" in 1999 (R. 355). Thus, this was not such a significant factor. Yet, it was not the sole basis for the ALJ's finding, and he relied on her daily activities reports and other evidence making his credibility findings legally sufficient.

## III.    RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any

objection must be served upon this Magistrate Judge.

**Note:** any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: July 10, 2007                           s/ Steven D. Pepe
Flint, Michigan                                United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet L. Parker, Brian Walker, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s):Michael J. Cantor, Gittleman, Paskel, 24472 Northwestern Highway, Southfield, MI 48075, Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606.

                                        s/James P. Peltier
                                        United States District Court
                                        600 Church St.
                                        Flint, Michigan 48502
                                        810-341-7850
                                        E-mail: pete_peltier@mied.uscourts.gov